**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**Case No. 22-cr-224 (NEB)**

United States of America,

                Plaintiff,

v.

Abdullahe Nur Jesow,

                Defendant.

**DEFENDANT'S POSITION**
**ON SENTENCING**

## INTRODUCTION

Mr. Abdullahe Jesow is a sixty five year old man whose life has been defined far more by hard work, resilience, service, and dignity than by the conduct that brings him to the position that he is in today. His path from an orphaned child in Somalia, to a refugee seeking safety, to an American citizen who worked tirelessly to support himself and contribute to his community, is remarkable. It is also a path marked by immense loss, dislocation, health challenges, and decades of working to build a stable life in a country far from the family he left behind.

The offense conduct in this case represents a serious lapse in judgment, one that Mr. Jesow has fully accepted responsibility for. But it stands in great contrast to the rest of his life—a life without a criminal history, without

substance abuse, and without violence. A life characterized by struggle and optimistic persistence. A life in which he spent years chasing the American dream as a first generation immigrant in America: driving taxis, working in child-care settings, and ultimately trying to build a small business, all while managing diabetes, high blood pressure, and the memory issues that arose in later years. And it is a life in which he has consistently relied on community, faith, and hard work rather than on any form of misconduct.

Today, Mr. Jesow is not a man seeking to evade accountability, but is one who has expressed remorse, agreed to restitution, complied with every condition of release, and meaningfully assisted authorities in understanding his own role in this misconduct. At his age, with his limited means, vulnerable health, and the lack of any remaining family in the United States, any sentence that this Court imposes will define the twilight of his life.

The law requires the Court to impose a sentence "sufficient, but not greater than necessary" to reflect the nature of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a). Here, those characteristics—his difficult early childhood, his decades of lawful and productive living, his health vulnerabilities, his limited personal gain from the broader scheme, and his

consistent efforts to make amends—are exactly the type of mitigating circumstances that § 3553(a)(1) requires the Court weigh carefully.

Against that backdrop, a downward variance is not only appropriate; it is necessary to ensure that Mr. Jesow's sentence is proportionate, individualized, and just. A sentence below the guidelines will properly address the purposes of federal sentencing while recognizing the humanity and unique life circumstances of Mr. Abdullahe Jesow.

### ABDULLAHE JESOW'S BACKGROUND

Abdullahe Nur Jesow was born in 1960 in Mogadishu, Somalia. His father passed away when he was 2 years old and his mother passed when he was 4 due to sicknesses and lack of healthcare. Mr. Jesow does not remember anything about his parents. PSR ¶ 81. He was raised with 5 siblings, and his oldest brother, Ali, helped raise him. PSR ¶ 81–82. Ali and his wife acted as parents to Mr. Jesow. They took him to school, and Mr. Jesow recalled that they treated him well. He attended a boarding school that was run by Americans for grade school and then moved to a local high school where he graduated in 1981. PSR ¶ 82. He never had any behavioral issues in school and reported that he was a good student. PSR ¶ 93.

Mr. Jesow and his family lived in a safe neighborhood, and he had many opportunities while growing up. His brother, Ali, was a businessman and owned several restaurants and grocery stores in the neighborhood, so finances were never an issue for their family. Mr. Jesow never witnessed violence, drug use, or alcohol consumption as a child because his family practiced Islam, which did not allow these activities. PSR ¶ 82.

After graduating high school, Mr. Jesow married Hani Gomey. He and his wife lived with Ali and the rest of his family for a few months until he was required to join the national military for one year. While in the military, Mr. Jesow completed bootcamp and war training. When he returned home and started attending college at the Somali National University in Mogadishu, Mr. Jesow studied economics. He graduated college in 1985 and started a career working for the Somali Ministry of Labor where he analyzed labor statistics in the country. During this time, he and his wife had two children, Sareda and Saed Jesow. PSR ¶ 83.

By 1998, government oppression and civil wars in Mr. Jesow's region of Somalia started escalating. Therefore, he decided it was best for he and his family to flee the country, and he paid someone to take them to the border of Somalia and Kenya. At the border, they resided in a refugee camp for 10 days before Mr.

Jesow sent his wife and children to live in Nairobi, Kenya, and he fled to the United States. PSR ¶ 84.

Mr. Jesow arrived in New York City and met other people fleeing from Somalia. He learned that there was a Somali community residing in Minneapolis, so he took a bus to Minnesota. After a few months of living with other asylum seekers there, he moved to Chicago where he hired an immigration lawyer. The immigration court granted him asylum, and he was able to obtain housing soon after. Mr. Jesow is still married to Ms. Gomey, but she and their children never joined him in the United States. He continues to speak with them but has not visited them since 2013. PSR ¶ 84.

In Chicago, Mr. Jesow resided with various roommates and worked as a taxi-cab driver. In 2017, Mr. Jesow became a Naturalized Citizen of the United States. In 2018, he moved back to Minneapolis because it became more difficult to work as a cab driver. PSR ¶ 85. Mr. Jesow had also been diagnosed with type 2 diabetes and high blood pressure and heard that Minneapolis was a good place to live. PSR ¶ 85 & 88. Once there, he found roommates and obtained housing right away. He then started working full time at a child day care center and worked there until 2020, when he opened a wedding venue called Benadir Hall. He worked there until 2022, when he was indicted in the instant offense. PSR ¶ 85.

Since then, Mr. Jesow has worked for several companies but noted that he has struggled to find stable employment due to this pending case. He is now employed 30 hours per week as a waiter, and his friends in the community help to support him financially. PSR ¶ 85 & 104. Mr. Jesow has hopes of studying accounting and statistics in the future. PSR ¶ 94. He previously owned a townhome but has since sold it and now resides in a rented apartment. PSR ¶ 104.

Only one of Mr. Jesow's siblings, Jina Jesow, is still living. She is 75 years old, lives in Europe, and Mr. Jesow is in contact with her once per month. His other siblings passed away from illness, heart attack, and old age. He is the only person in his family that relocated to the United States. PSR ¶ 81. Regarding his own health, Mr. Jesow has regularly seen a health care provider for several years at Allina Health and is prescribed Metformin and Lisinopril for his diabetes and blood pressure. PSR ¶ 88. Additionally, he has suffered from some memory problems in the past but has never had any other mental health concerns. PSR ¶ 89. Mr. Jesow has no history of consuming alcohol or using any controlled substances. PSR ¶ 92.

One of Mr. Jesow's friends, Ali Osman, stated that he worked as an interpreter for Mr. Jesow when he attended his medical appointments. Mr. Osman noted that he has known Mr. Jesow since he was a child in Somalia and

that Mr. Jesow was a "very good man" who came from a "good family." Mr. Osman also said that he believed Mr. Jesow made a mistake in the instant case. PSR ¶ 86.

The instant offense involved Mr. Jesow's participation in defrauding Federal Child Nutrition Program during the COVID-19 pandemic. He was listed as the Secretary of Aspiring Youth and operated the Benadir Hall, as discussed. PSR ¶ 129. Mr. Jesow often operated at the direction of his other co-conspirators, and, at times, those co-conspirators *used his name on paperwork without his knowledge*. PSR ¶ 131. He did not fully know his co-conspirator's intentions during different periods of the fraud, but he used approximately $100,000.00 in FCNP funds to purchase a personal residence and knew that AYE was not operating in an educational capacity. PSR ¶ 129 & 131. And Mr. Jesow admitted that he caught on that there was fraud after a while and he did not report it.

Mr. Jesow has no criminal history. PSR ¶ 78. He has only received traffic citations that have either been dismissed or settled through fine payments. PSR ¶ 79. In the instant case, he has agreed to pay restitution, has accepted responsibility for his role in the offense, had has assisted authorities in the investigation of his own misconduct. PSR ¶ 60, 71–72. He has also been compliant with the conditions of his release including home inspections. PSR ¶ 6.

## I.   PURSUANT TO 18 U.S.C. § 3553(a), MR. JESOW SEEKS A

**DOWNWARD VARIANCE TO THE SENTENCING GUIDELINES**.

The Supreme Court has made clear that, when imposing a sentence, the district court must make an "individualized assessment" based on all the 18 U.S.C. §3553(a) factors. *Gall v. United States*, 128 S. Ct. 586, 597 (2007). The overarching consideration for judges is a sentence that is "sufficient but not greater than necessary" to meet the goals of sentencing. 18 U.S.C. § 3553(a). That means the *least* restrictive sentence.

A. **The nature and circumstances of the offense and the history and characteristics of the defendant**

a. *History and Characteristics of the Defendant*

Mr. Abdullahe Jesow was born in Somalia and lost both of his parents to illness before the age of five. His older brother acted as a father figure and provided guidance throughout his childhood. Despite these early difficulties, Mr. Jesow attended a boarding school through eighth grade, completed high school, and served one year in the Somali military. He later completed college with a degree in economics and worked for the Somali government.

When civil war and violence disrupted his home region, Mr. Jesow fled with his wife and two children to Kenya. Ultimately, he immigrated alone to the United States, while his family remained behind. Since arriving in the United

States, he has held full-time employment, maintained stable housing for over two decades, and contributed positively to his community.

Mr. Jesow is now 65 years old. He is mentally and emotionally stable, manages his mild medical conditions, and although he has limited remaining family ties, he has many friends who support him. Despite his early loss of parental guidance, his older brother provided stability, and he has showed independence and perseverance throughout his life. He has worked continuously in various professions, showing an entrepreneurial spirit and interest in further studies in statistics and accounting.

Courts may consider these characteristics—age, education, mental and emotional condition, medical condition, employment history, family ties, military service, and public service—under § 3553(a)(1). *Rita v. United States*, 127 S. Ct. 2456, 2473 (2007) (Stevens, J. and Ginsburg, J. concurring); *United States v. Chase*, 560 F.3d 828, 830–31 (8th Cir. 2009). The law specifically authorizes consideration of the defendant's "history and characteristics." 18 U.S.C. § 3553(a)(1). The judge may also consider accounts of the defendant's character. *United States v. Wachowiak*, 496 F.3d 744 (7th Cir. 2007). Here, Mr. Osman, who has known Mr. Jesow his entire life, reported that Mr. Jesow is an upstanding man who simply made a significant mistake in an otherwise remarkable life.

b. *Nature and Circumstances of the Offense*

The offense involved Mr. Jesow's participation in a scheme to defraud FCNP during the COVID-19 pandemic. What came to light, and what drove a plea to the money laundering count rather than the wire fraud count, was the nature of his relative naiveté for much of the conduct orchestrated by Qamar Hassan and Sahra Nur.

What Mr. Jesow did not know in the beginning, but came to learn while still working, was that the number of meals being claimed to be served were inflated. Even then, Mr. Jesow was not the one filling out meal count sheets. Yet once he became suspicious by seeing coconspirators spending large amounts of money, he did not report it, and he himself received $100,000 which he purchased a house with.

In further detail, Mr. Jesow states that Sahra Nur established Academy for Youth Excellence and put Mr. Jesow's name on the business filings. Doc. 392 at p. 3. Sahra Nur operated Academy for Youth Excellence. Mr. Jesow had no control over Academy for Youth Excellence. Sarah Nur controlled the Academy for Youth Excellence bank account as its sole signatory. Doc. 392 at p. 3. Nur and Hassan handled all of the paperwork.

In total, Mr. Jesow and several co-conspirators received $4.3 million in FCNP funds, of which he used approximately $100,000 to purchase a residence in

Columbia Heights, Minnesota. Mr. Jesow has agreed to pay $866,458 in restitution.

Compared to the conduct of other participants, Mr. Jesow was less culpable. *See United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007). He personally possessed and used only a small portion of the finances. While his conduct is criminal, the relative scope of his enrichment and participation is an allowed consideration under § 3553(a). *Id.* Further, this offense is an isolated event in the context of an otherwise honorable and law-abiding life. *See United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008). Mr. Jesow's life history reflects lawful conduct and service before *and after* this point. *Id.*

B.  **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

The COVID-19 pandemic created severe challenges across society. However, the record reflects that others in the conspiracy directed the scheme and used Mr. Jesow's name on paperwork without his knowledge. He did not understand the full intentions of his co-conspirators until much later, and even then, he did not have a robust understanding of everything the more sophisticated co-defendants were doing, although he suspected and then actually learned fraud was occurring. While he acknowledges poor judgment in participating, he was not similarly situated to others who were deeply embedded

in the scheme. *See United States v. Garate*, 543 F.3d 1026 (8th Cir. 2008). Judges may consider the need to avoid disparities among co-conspirators. *Id.* Mr. Jesow has cooperated with authorities and complied fully with his supervised release. He accepts responsibility and poses no risk of recidivism. *See United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008).

We notice that the government is seeking a sentencing of the top end of Mr. Jesow's guidelines (51 months). While it cites various § 3553(a) factors, it appears to be relying heavily on the deterrent factor here, even in light of mitigating factors. Mr. Jesow is not disputing that there was an unprecedented fraud which occurred during the pandemic era food program here in our State. But he would respectfully decline to agree with the government's very broad comment that the Court should view Mr. Jesow's crime in the context of "the rampant fraud that has plagued Minnesota in recent years" as a general matter and to the extent that fraud appears to have been a continuing problem. The larger issue of fraud in Minnesota is a problem which is not going to be solved through prosecution; and suggesting that imposing a sentencing at the top of the guideline range here (51 months) will deter some larger fraud issue – which will largely involve a political solution - is not fair or accurate. Mr. Jesow is not suggesting that the Court should not consider deterrence; it should. However, the defense is concerned about the amount of weight that the government may

suggest to ascribe to that factor when it asks the Court to impose 51 months. *See*

discussion in *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008)

(Kavanaugh) "Moreover, the Government's argument based on deterrence alone

is flawed because it elevates one § 3553(a) factor—deterrence—above all others.

As § 3553(a) makes clear, however, the district court at sentencing must consider

and balance a number of factors—not all of which will point in the same

direction.").

What we suggest is helpful here is that this Court may consider a

defendant's conduct on pretrial release when evaluating deterrence. *United States*

*v. Munoz-Nava*, 524 F.3d 1137, 1148–49 (10th Cir. 2008). Here, the record supports

that Mr. Jesow is sufficiently deterred and unlikely to reoffend. His continuous

full-time employment history, long period of compliant pretrial release, and lack

of criminality either before or after this isolated event support this finding.

Similarly, on this record, there is no indication that the public requires protection

from future criminal conduct by Mr. Jesow.

C.  <u>The need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment on the most effective manner</u>

Although Mr. Jesow may benefit somewhat from vocational training

available in the Bureau of Prisons to build upon his education and expand his

employment opportunities slightly, he is not in dire need of this training. He has

a high school diploma and college degree in economics. He has a history of working in government and has consistently held full-time jobs ever since he graduated college. Additionally, even with his slight health struggles, he is not in need of further medical care as he has consistently been attending healthcare appointments and has managed his conditions with the proper prescriptions. Ultimately, the requirement for his sentence to provide him with needed training or medical care is not a reason for a lengthy custodial sentence at the top of the guideline range.

## OTHER REASONS FOR DOWNWARD VARIANCE

Uncontested mitigating facts are present on the record that further support a below-guideline sentence for Mr. Jesow. These factors include the significant punishment already imposed due to the prolonged uncertainty surrounding his sentence and future. Mr. Jesow has spent an unusually long time with the weight of this federal case hanging over him. This period has been marked by isolation and loss of employment for a long time due to the instant Indictment. After the Indictment, Mr. Jesow's business—which had been successfully operating *before* the food program became an issue—was instantly closed as news of the indictments spread quickly and food suppliers went out of business as well. At his age, with a federal Indictment hanging over his head, and with limited usefulness of his degree from Mogadishu (he became a cab driver in the United

States), his employment prospects were bleak. He continuously attempted to find employment, but it proved to be very difficult to secure. He did again find work however, and he continues to work even up to his sentencing date.

Mr. Jesow has been living under the cloud of an uncertain future for over three and a half years, a period extending through his arrest and plea, leaving him in a prolonged state of anxiety and worry, not knowing when or how severe the outcome would be. We do not present this as an accusation of misconduct; there was none. The delays were due to necessary investigation, litigation, and negotiations. These are delays for which the prosecution is in no way responsible. However, the passage of time and the attendant uncertainty is itself a form of punishment that the Court can — and should — consider.

Extended uncertainty has been repeatedly recognized by this Court and others in this District as a basis for sentencing mitigation. Judges have accepted the commonsense notion that delay between the offense and sentencing is a salient circumstance that can itself warrant lesser punishment. The reasoning behind this notion is clear: waiting month after month causes and amplifies anxiety and stress, constituting a form of punishment repeatedly recognized by judges of this Court.[1]

---

[1] *See e.g.*, *United States v. Althea Jackson*, District of Minnesota Criminal Number 14-06 (PJS). Althea Jackson waited 26 months for the government to indict her, and another nine for her sentencing. She was not detained. The Court found that this delay caused her to "suffer a considerable amount of anxiety and stress,"

In advancing this argument, counsel and Mr. Jesow fully recognize his responsibility for his crimes and the expectation of punishment.  He is the primary cause of the uncertainty he has experienced and had he remained law-abiding, he would not have had to face the threat of impending conviction and the uncertainty of his punishment.  Still, the fact that he committed these crimes does not diminish the reality  of the punishment that has already been imposed.  This Court, as others before it, can and should factor such a preexisting punishment into its sentencing considerations.

### CONCLUSION

Mr. Jesow asks the Court to grant his motion for variance and give him a sentence substantially lower than the guidelines range.

Respectfully submitted,

**RYAN PACYGA CRIMINAL DEFENSE**

Dated:  March 25, 2026                  By:     /s/Ryan M. Pacyga

Ryan M. Pacyga (#321576)
860 Blue Gentian Rd., Ste. 175
Saint Paul, MN 55121
612-339-5844 (phone)
*E-mail:* *ryan@arrestedmn.com*
*Attorney for Defendant*

---

contributing to the Court's decision to vary downward to a sentence of probation. The Court found similar considerations to be mitigating and supportive of a variance in *United States v. Pierson*, District of Minnesota Criminal No. 14-069 (PJS) and *United States v. Turnquist*, District of Minnesota Criminal No. 14-091 (JRT) (variance to probation).